UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 06-877(DSD/JJG)

R&A Small Engine, Inc.,

    Plaintiff,

v.                                             **ORDER**

Midwest Stihl, Inc.,

    Defendant.

    Roger E. Meyer, Esq. and Hajek, Meyer & Beauclaire, 3433 Broadway Street N.E., Suite 110, Minneapolis, MN 55413, counsel for plaintiff.

    D. Clay Taylor, Esq., 1300 Nicollet Mall, Suite 5002, Minneapolis, MN 55403, counsel for defendant.

This matter is before the court upon defendant's motion for summary judgment. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court grants defendant's motion.

**BACKGROUND**

Plaintiff R&A Small Engine, Inc. ("R&A"), commenced this action against defendant Midwest Stihl, Inc. ("Midwest Stihl") following Midwest Stihl's decision to terminate R&A as an authorized retailer of Stihl products. Midwest Stihl is the exclusive distributor in Minnesota of handheld power equipment manufactured by Stihl, Inc. ("Stihl"). R&A is a multi-line retail

equipment store in Osseo, Minnesota, and Roger Sirois is the company's owner and sole shareholder. R&A opened for business in October 2002 and went out of business after Midwest Stihl terminated R&A's right to sell Stihl products in May 2004.

Prior to opening, R&A applied to become a Stihl retailer. Sirois completed Midwest Stihl's standard credit application and signed Midwest Stihl's inventory security agreement. Midwest Stihl provided Sirois documentation that he refers to collectively as Midwest Stihl's "policies and procedures." (Sirois Aff. ¶ 4, Ex. A.) Midwest Stihl and R&A's dealership agreement was oral. R&A did not pay an initial or up-front fee to become a retailer of Stihl products.

Midwest Stihl implemented two types of advertising programs throughout the course of its relationship with R&A, a regional advertising program and an advertising co-op. (Gant Aff. ¶ 5.) Under the regional advertising plan, R&A was assessed an amount equal to one percent of the invoice price of the Stihl products it purchased.[1] Midwest Stihl placed the funds received in a segregated advertising fund, to which Midwest Stihl also contributed, and used the monies to conduct regional print and advertising for Stihl products. Midwest Stihl derived no income or

---

[1] R&A purchased a total of $48,658 in Stihl products: $18,501 in 2002, $19,150 in 2003 and $11,007 in 2004. (Froemel Aff. ¶ 4.) Over its twenty-month relationship with Midwest Stihl, R&A contributed less than $500 to the advertising fund. (Sirois Dep. at 112.)

profit from its administration of the advertising account. Midwest Stihl also operated a co-op advertising program. Midwest Stihl gave each retailer an advertising budget based on the retailer's purchases in the prior year. Against that budget, Midwest Stihl would credit fifty percent of the retailer's individual advertising costs if the retailer used proper advertising medium and adhered to certain advertising conditions and qualifications. All funds related to the advertising "co-op" came directly from operating revenues of Midwest Stihl and not individual retailers.

In addition to the one-percent assessment, R&A paid a total of $369 to Midwest Stihl for yellow page listings. Within its designated multi-state territory, Midwest Stihl pays all costs for Stihl yellow page listings that are associated with trademarked graphics and advertising and half of the charges for individual dealer listings. Midwest Stihl bills individual retailers, such as R&A, the other half of the cost for the dealer listings. Midwest Stihl realizes no revenue or profit from the yellow page listings. (Heinkell Aff. ¶¶ 3-4.)

R&A placed its first order for Stihl products in October 2002 and was in default under the terms of the inventory security agreement by December 2002. (Froemel Aff. ¶ 2.) From that point forward, Midwest Stihl sold products to R&A only on a C.O.D. or a certified check. (Id.) From December 2002 through May 2004, Sirois discussed the delinquent status of R&A's account numerous

3

times with Midwest Stihl's accounts receivable manager, Judy Froemel. (Id. ¶ 3, Ex. A.) Sirois testified that he understood that pursuant to the thirty-day net credit terms of the inventory security agreement, Midwest Stihl had the right to cancel the relationship if R&A failed to pay its invoices. (Sirois Dep. at 43-44.) R&A's account was continuously past due and Sirois repeatedly worked out arrangements with Midwest Stihl to make payments.

In May 2004, Midwest Stihl decided it could no longer do business with R&A as a result of the continued delinquent status of R&A's account. (Gant Aff. ¶ 6.) On May 27, 2004, Midwest Stihl informed Sirois that it would no longer be selling Stihl products to R&A. Sirois signed a termination agreement that outlined, among other things, Midwest Stihl's inventory repurchase and restocking policies. However, Sirois wrote "I don't agree" underneath his signature. (See Sirois Dep. Ex. 4.)

Sirois, in his individual capacity, commenced this action in Minnesota state court against Midwest Stihl seeking lost profits and alleging that Midwest Stihl violated the Minnesota Heavy and Utility Equipment Dealer Act ("HUEDA") and the Minnesota Franchise Act ("MFA"), tortiously interfered with his business expectancy and negligently inflicted emotional distress. Midwest Stihl removed the case to this court based on diversity of citizenship pursuant to 28 U.S.C. § 1332. Sirois thereafter amended his complaint to

name R&A as a plaintiff.  All claims asserted by Sirois in his individual capacity as well as R&A's claim of negligent infliction of emotional distress have been dismissed by stipulation of the parties.  R&A has also voluntarily dismissed its HUEDA claim.  (See Meyer Aff. ¶ 2.)  Midwest Stihl now moves for summary judgment on the MFA and tortious interference claims.

## DISCUSSION

### I.   Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material only when its resolution affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 255.  The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth

5

specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id. at 322-23. To successfully oppose a motion for summary judgment a plaintiff "may not merely point to unsupported self-serving allegations, but must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor." Bass v. SBC Communications, Inc., 418 F.3d 870, 872-73 (8th Cir. 2005).

**II.   Minnesota Franchise Act Claim**

Under the MFA, a plaintiff claiming a franchise relationship must prove: (1) a right granted in the franchisee to engage in the business of offering or distributing goods using the franchisor's trade name, trademark, advertising or other commercial symbol, (2) a "community of interest" in the marketing of goods or services between the franchisee and franchisor and (3) that the franchisee paid a "franchise fee." Minn. Stat. § 80C.01, subd. 4; Martin Investors, Inc. v. Vander Bie, 269 N.W.2d 868, 874 (Minn. 1978). Midwest Stihl argues that R&A is unable to establish that it paid a "franchise fee" or that there existed a "community of interest" between Midwest Stihl and R&A.

A "franchise fee" is any fee or charge that a franchisee is required to pay "for the right to enter into a business or to continue a business under a franchise agreement." Minn. Stat. § 80C.01, subd. 9. A franchise fee can include, but is not limited to, initial capital investment fees, fees based on a percentage of gross or net sales, payments for goods or services and training fees or charges. Id. However, ordinary business expenses do not constitute a franchise fee. See RJM Sales & Mktg., Inc. v. Banfi Prods. Corp., 546 F. Supp. 1368, 1373 (D. Minn. 1982) (payments for samples and advertising payments to outside firms are ordinary business expenses and receipt of lower-than-average commission not indirect franchise fee); OT Indus. Inc. v. OT-Tehdas, 346 N.W.2d 162, 167 (Minn. Ct. App. 1984) (mandatory advertising payments to outside firms are ordinary business expenses).

Although Minnesota courts have not directly addressed the extent to which advertising fees paid to a distributor can be considered indirect franchise fees for purposes of the MFA, in the context of minimum purchase commitments Minnesota courts have not adopted a brightline approach to determining the existence of an indirect franchise fee. See OT Indus. Inc., 346 N.W.2d at 167 (minimum volume requirement not indirect franchise fee given history of parties' relationship). Rather, Minnesota courts have focused on the reasonableness of the minimum purchase commitments and acknowledged that such commitments could be deemed an indirect

franchise fee if unreasonable under the circumstances. <u>Upper Midwest Sales Co. v. Ecolab, Inc.</u>, 577 N.W.2d 236, 241-43 (Minn. Ct. App. 1998)(minimum purchase commitments not unreasonable thus not indirect franchise fees); <u>see also</u> <u>Banbury v. Omnitrition Int'l Inc.</u>, 533 N.W.2d 876, 882 (Minn. Ct. App. 1995) ($4,000 minimum initial purchase not indirect franchise fee); <u>Am. Parts Sys., Inc. v. T&T Auto., Inc.</u>, 358 N.W.2d 674, 677 (Minn. Ct. App. 1984) (mandatory $80,000 inventory restocking not unreasonable thus not indirect franchise fee).

In this case, R&A argues that the one percent of purchases that R&A paid for regional advertising and its payment of fifty percent of the cost of the yellow page listings are indirect franchise fees. In addition, R&A argues that a one-time $10 fee Sirois paid to cover the cost of a catered lunch at a technical service update seminar in 2003 is an indirect franchise fee. (<u>See</u> Heinkell Aff. ¶ 5.) As a threshold matter, the court finds that the costs of the yellow page listings and the $10 fee are ordinary business expenses. Further, there is no evidence that R&A paid these expenses for the right to enter into the business of selling Stihl products. Therefore, these are not "franchise fees."

As to the advertising fee, this court has previously held that the Midwest Stihl advertising fee is not a "franchise fee," and R&A has not provided the court with any authority that would warrant a

departure from that holding.[2]  See McGarvie v. Midwest Stihl, Inc., Civ. No. 4-96-1109, Doc. No. 38 (DSD/JMM) (D. Minn. Sept. 2, 1997). R&A did not pay into the advertising co-op, which was funded exclusively by Midwest Stihl.  The one-percent regional advertising fee was not based on R&A's percentage of gross or net sales but on the amount of inventory purchased from Midwest Stihl.  The fee went into a segregated account, and its exclusive purpose was to benefit retailers through regional advertising.  Midwest Stihl derived no income or profit from the fee or the administration of the advertising fund, and the advertising fund is not included in its operating revenues.  (Grant Aff. ¶ 5.)  Rather, it was a reasonable and ordinary business expense that directly benefitted R&A and is distinguishable from the types of payments Minnesota courts have recognized as franchise fees.  See, e.g., Current Tech. Concepts, Inc. v. Irie Enters., Inc., 530 N.W.2d 539, 543 (Minn. 1995) ($125,000 payment in consideration for resale agreement); Martin Investors, 269 N.W.2d at 875 (initial $30,000 investment, reservation of one-percent share of loan proceeds and $400 payments for units of service purchased).

---

[2] R&A relies heavily on a prior, unpublished decision of this court, in which the court evaluated whether a co-op advertising fund constituted a "franchise fee" in order to determine whether the plaintiff was entitled to a presumption of irreparable harm in the context of a preliminary injunction.  See Pool Concepts, Inc. v. Watkins, Inc., Civ. No. 02-27, Doc. No. 20 (DSD/JMM) (D. Minn. Jan. 29, 2002).  However, in Pool Concepts the court did not reach the merits of the parties' dispute.

R&A has not established that it paid a "franchise fee." Therefore, R&A's relationship with Midwest Stihl was not a franchise, and summary judgment is warranted on its MFA claim.

**III. Tortious Interference with Business Expectancy**

Midwest Stihl argues that R&A is unable to establish a claim for tortious interference with business expectancy.[3] To be successful on such a claim, a plaintiff must prove (1) that it had a reasonable expectation of economic advantage or benefit, (2) the defendant knew of that expectation, (3) the defendant wrongfully interfered with the expectation without justification, (4) a reasonable probability that but for defendant's conduct plaintiff would have realized the advantage or benefit and (5) damages. Lamminen v. City of Cloquet, 987 F. Supp. 723, 731 (D. Minn. 1997) (citing United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628, 632-33 (Minn. 1982)).  "Mere loss of unspecified business" does not

---

[3] In response to Midwest Stihl's motion for summary judgment R&A summarily argues, in one sentence, that Midwest Stihl has failed to set forth a factual or legal basis to support summary judgment on R&A's tortious interference claim. At oral argument, R&A argued that a tortious interference with business expectancy claim is distinct and substantively different from a tortious interference with prospective contractual relations claim. R&A provides no authority to support that proposition, and the court finds the argument unavailing because both torts are based on Restatement (Second) of Torts § 766B (1979). Cf. Hern v. Bankers Life Cas. Co., 133 F. Supp.2d 1130, 1137 (D. Minn. 2001) ("Under Minnesota law, [there are] two possible tortious interference claims: (1) tortious interference with an existing contract; or (2) tortious interference with a prospective business relation or, as it is sometimes referred to, a prospective economic advantage.").

suffice to establish interference with business advantage. <u>H Enters. Int'l, Inc. v. Gen. Elec. Capital Corp.</u>, 833 F. Supp. 1405, 1417 (D. Minn. 1993). A plaintiff must establish wrongful, intentional conduct that affected specific relationships. <u>Id.</u>

According to Sirois, he informed Midwest Stihl that he was beginning to see repeat customers for Stihl products. (Sirois Aff. ¶ 13.) Following Midwest Stihl's termination of its relationship with R&A, Midwest Stihl opened a nearby Stihl dealership, and Sirois has seen stores that sell Stihl products within a fifty-mile radius of R&A. (<u>Id.</u> ¶ 12.) Sirois asserts that R&A's customers would have continued to do business with R&A if it had not gone out of business. (<u>Id.</u> ¶ 14.)

R&A's tortious interference claim is based entirely on the alleged economic advantage it lost when Midwest Stihl terminated its relationship with R&A. (<u>See</u> Sirois Dep. at 101-02.) Other than its self-serving allegations, R&A has not provided the court any evidence that Midwest Stihl intentionally or wrongfully interfered with R&A's business expectancy without justification. R&A's account was repeatedly delinquent throughout the duration of the parties' relationship. Moreover, R&A at most alleges "mere loss of unspecified business," which is not enough to succeed on a tortious interference with business expectancy claim. <u>H Enters. Int'l, Inc.</u>, 833 F. Supp. at 1417. R&A has failed to provide any evidence in support of its tortious interference claim on which a

jury could reasonably find in its favor. Therefore, summary judgment is warranted on that claim.

## CONCLUSION

Therefore, **IT IS HEREBY ORDERED** that defendant's motion for summary judgment [Docket No. 9] is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: December 20, 2006

                                              s/David S. Doty  
                                              David S. Doty, Judge  
                                              United States District Court